FILED

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

03 MAR 26  AM 9:50

U.S. DISTRICT COURT
N.D. OF ALABAMA

TINA HOLSOMBACH,       )
        )
    Plaintiff,        )
        )
v.        ) CIVIL ACTION NO. 00-JEO-3177-S
        )
MCCRORY BUILDING COMPANY,    )
INC.,        )
        )
    Defendant.       )

ENTERED

MAR 26 2003

### MEMORANDUM OPINION

The plaintiff, Tina Holsombach (hereinafter "Holsombach" or "the plaintiff"),[1] filed this action asserting various claims against McCrory Building Company (hereinafter "McCrory"). Specifically, the plaintiff asserts that she was subjected to a hostile work environment premised on her gender in violation of Title VII of the Civil Rights Act of 1964. (Doc. 1). The plaintiff amended her complaint to assert that McCrory terminated her employment in retaliation for her assertion of a charge of sexual harassment. (Doc. 15). Further, the plaintiff asserts that defendant intentionally inflicted emotional distress, committed the tort of outrage, and negligently and/or maliciously supervised or trained its employees. (*Id.*). The case is presently before the court on the defendant's motion for summary judgment on the plaintiff's claims. (Doc. 22).

---

[1] The defendant hired plaintiff as Tina Vansant. She was married thereafter and filed this action under the name Tina Constantino, but has since returned to using her maiden name of Holsombach.

37

## FACTS[2]

### The Plaintiff's Situation

On March 13, 2000, Holsombach filed an application for employment with the defendant at its Meadow View job site in Shelby County. (Holsombach Dep. at 68; Application).[3]  The defendant hired Holsombach on March 15, 2000, at which time she signed and was given a copy of McCrory's sexual harassment policy. (Doc. 23, Ex. 2).  At some point within her first two weeks of employment, Holsombach confronted her foreman, Greg Harrelson (hereinafter "Harrelson") about whether she could eat bananas or Blowpops at the job site after another employee, Beverly Kizzire (hereinafter "Kizzire"), told her she could not bring them to the job site. (Holsombach Dep. at 80, 82-83).  The plaintiff said Harrelson told her not to eat bananas and Blowpops because they "bother[ed] him sexually." (*Id.* at 80).  Holsombach states that when she told Harrelson that it was not fair for her not to be able to bring the foods, he told her to eat her fruit and never mention it again. (*Id.* at 82-83).

A few weeks after that conversation with Harrelson, he came up to her when she was working in a classroom alone, patted her shoulder and told her she was doing a good job. (Holsombach Dep. at 81).  Holsombach told Kizzire about the incident and her dislike of people touching her. (*Id.* at 84).

At "some point after [she] went to work" for McCrory, when the plaintiff was riding in

---

[2] The facts set out below are gleaned from the parties' submissions and are viewed in the light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator v. U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[3] Deposition of Tina Holsombach is found at document 27, exhibit 9.  Her employment application is found at document 23, exhibit 1.

the Gator, a golfcart-like vehicle, with Harrelson to fill water coolers, he made comments about the plaintiff's breasts shaking and that he liked to watch them shake. (Holsombach Dep. at 85-87, 90). Four times during those rides, Harrelson told Holsombach that "he wanted [Holsombach] to go have sex with him back there at the creek." (*Id*. at 90-91). Holsombach responded by saying, "I couldn't do anything like that." (*Id*. at 94). Harrelson told Holsombach at least two times in response that he was McCrory and could fire anybody that he wanted to. (*Id*. at 95).

After the incidents during the Gator rides, Harrelson asked her to stay behind after a group meeting at the job trailer. (Holsombach Dep. at 96). While standing outside of the trailer, he "asked [Holsombach] to have sex with him at a motel, and wanted [her] to dress up as a cop," as well as dance for him. (*Id*. at 96-97). He said he would pay her $500.00. (*Id*. at 97). He told her she could buy the uniform at a store on Lorna Road. (*Id*. at 97). Holsombach said that Harrelson propositioned her twice in this manner. (*Id*. at 97).

A few weeks later, when the Meadow View job was ending, but before July 21, 2000, Holsombach said that Harrelson told her "that when we [get] to the Helena job site that if I would just come to the trailer when we [get] there and have sex with him in the trailer he would give me a high-paying job and my own crew." (Holsombach Dep. at 100).

On May 17, 2000, Holsombach signed a second copy of the defendant's sexual harassment policy. (Doc. 23, Ex. 4). Holsombach never told Harrelson to stop making comments of a sexual nature or that he was making her uncomfortable because she was afraid that he would fire her. (Holsombach Dep. at 97).

On July 21, 2000, Holsombach asked Darrell Jones (hereinafter "Jones"), a supervisor, to

3

set up an appointment for her with Fred Schafer (hereinafter "Schafer") at the McCrory offices in

Birmingham. Jones did so and a meeting was set for Monday, July 24, 2000 at 4:15 p.m. (Doc.

23, Ex. 7). During the meeting, Schafer initially asked if Holsombach's concerns were an EEOC

issue. (*Id.*). When she responded in the affirmative, he called in Bradley Judy, Jeff Byrd, and

Wayne Williford (hereinafter "the Panel"). (*Id.*). Holsombach told them that Harrelson had been

harassing her for the past three months. She made the following specific allegations:

1. Harrelson showed favoritism toward her by giving her rides on the A.T.V. during which he asked her to have sex with him at the pond.

2. Harrelson asked her to come to work on Sunday to have sex with him. Holsombach did go to the work site, but said there was no one there.

3. Holsombach asked Harrelson for a $500 advance. Harrelson told her that he could not loan her the money, but he would go to a motel and let her dance on a table for $500.

4. Harrelson promised her a crew and a position when she transferred to Helena. She said she felt as though this was to be a trade off for future sexual favors.

5. Harrelson hugged her once at Meadow View and once at Helena.

(Doc. 23, Ex. 5). Holsombach also stated that "maybe Allen Massey, Sr. or Steve or George

Lutz" would be able to substantiate her claims. (Doc. 23, Ex. 5 at 2). During the course of this

meeting, Holsombach also informed the Panel that two other employees, Kizzire and Terry Lane

(another supervisor), were having an affair and that Kizzire's husband had made threats against

Terry. (*Id.*). The Panel told Holsombach not to return to work until the investigation had been

completed and that she would be paid during this time. (*Id.*).

On July 28, 2000, Holsombach sought psychiatric care from Alabama Psychiatric

Services. (Holsombach Dep. at 188). She was given a doctor's order to not work for

4

approximately two weeks. (*Id.*; Doc. 23, Ex. 9). She provided the note to the defendant. (Holsombach Dep. at 189). She was later given another doctor's order excusing her from work until August 21, 2000. (*Id.* at 191; Doc. 23, Ex. 9 (Alabama Psych. Serv. Note dated August 17, 2000)). Holsombach returned to work on August 21, 2000. (Holsombach Dep. at 170, 175, 191).

On July 31, 2000, the Panel interviewed Harrelson by presenting Holsombach's allegations and requiring him to respond. (Doc. 23, Ex. 6). He denied that there was any inappropriate sexual behavior. (*Id.*). Also on July 31, 2000, the Panel asked employees George Lutz and Steve Lutz separately whether either had seen "any physical or verbal harassment to [sic] Tina by Greg." (Doc. 23, Ex. 6). Each answered no. (*Id.*). That same day, the Panel created its "Resolution and Recommendations," which provided that the plaintiff's claims "could be neither proven or unproven through this panels [sic] findings." (Doc. 23, Ex. 7). The Panel concluded that the following actions should be taken:

1. Tina Constantino shall be sent back to work at her previous project employment.

2. Tina Constantino shall report to Darell [sic] Jones for her job duties and functions.

3. Any needed meetings between Tina Constantino and Greg Harrelson shall take place with Darell [sic] Jones present. If Darell [sic] is not available, the job site superintendent or assistant shall be present.

4. To assist Greg Harrelson, MBCI will make available and recommend that Greg attend sensitivity/management training.

5. MBCI will also provide future monitoring of this situation.

6. Both parties shall be reminded of the confidentiality of this matter.

7.      Both parties shall be reminded that any retaliation will not be tolerated by MBCI.

(*Id.*).  Harrelson was not offered any sensitivity training as recommended.  (Harrelson Dep. at 43-44).

On August 3, 2000, the Panel met with Holsombach to present and review its "Resolutions and Recommendations" with her.  (Holsombach Dep. at 167; Doc. 23, Ex. 8). Holsombach told the Panel that the resolution was satisfactory and that she "felt better about the situation."[4]  (Holsombach Dep. at 170, 175; Doc. 23, Ex. 8).

On August 8, 2000, Holsombach had an appointment with her therapist.  (Doc. 23, Ex. 6). The therapist told her she could not be released back to work until the doctor determined it was appropriate.  (*Id.*).

On August 10, 2000, Holsombach filed her first  EEOC charge against McCrory alleging no action had been taken against the harasser and that "although a management employee has been assigned to be present at any meetings between me and Greg Harrelson, '[she] continue[s] to be intimidated by his presence at the work site.'"  (Doc. 23, Ex. 11).

Shortly after the plaintiff returned to work on August 21, 2000, the defendant ordered a drug testing of the employees at Holsombach's site.  (Doc. 23, Ex. 6 (Def. Ex. 21)).[5]  On August 23, 2000, Holsombach left early as she was "visibly shaken because of problems with her spouse" and did not return on the following day.  (*Id.*).  On August 25, 2000, Holsombach told Jones she felt as though she caused the drug screening and no one was talking to her because they

---

[4] In her deposition, the plaintiff at one point stated that she told the Panel she was satisfied.  (Holsombach Dep. at 170).  A short time later, she testified that she did not tell them that she was satisfied.  (*Id.* at 176-77).

[5] Because various documents are included in this exhibit, they are further identified by the attached deposition labels.

6

had been told not to.[6]  (*Id.*).

On August 28, 2000, Holsombach filed another charge of discrimination with the EEOC, alleging that "McCrory employees and independent contractors have been told not to talk with me and that I am a home wrecker." (Doc. 23, Ex. 11).

On August 30, 2000, Bradley Judy and Fred Schafer visited Holsombach on her job to inquire about how "the resolution" was working. (Doc. 23, Ex. 6, Def. Ex. 23). Holsombach told them that Harrelson had not harassed her since she filed the complaint with the Panel. (*Id.*; Holsombach Dep. at 278-79).

On October 12, 2000, Holsombach again was taken off of work for a two-week period by her doctor. (Doc. 23, Ex. 9). She had an appointment on October 23, 2001, with her doctor's nurse and a counselor. Her doctor extended her time away from work for another two weeks on October 27, 2000. (*Id.*).

On November 7, 2000, Holsombach filed her complaint in this action. (Doc. 1).

On November 15, 2000, Holsombach's doctor released her for work on November 20, 2000. (Doc. 23, Ex. 10). Holsombach returned to work on November 20, 2000.[7] (Holsombach Aff. at ¶ 17). Holsombach was terminated on her first day back on the job. (Harrelson Dep. at 104-10). Between October 27, 2000, and November 15, 2000, the defendant had terminated approximately eleven laborers because no work was available or because they did not show up for work. (Doc. 23, Ex. 16; Harrelson Dep. at 104-10).

------------------------------------------------------------

[6] Although the plaintiff asserts that the drug screening was a consequence of her actions, the defendant denies this. The plaintiff has offered nothing to refute the defendant's evidence (Judy's Notes (August 25, 2000)) that her situation had nothing to do with the drug screening. (Doc. 23, Tab 6, Def. Ex. 21).

[7] The defendant contends Holsombach never showed back onto the site until December 6, 2000. (Harrelson Dep. at 104-10). However, the court must construe the evidence in a light most favorable to the plaintiff at this juncture.

### Other Conduct Involving Harrelson

On December 23, 1999, Jeff McDaniels, the husband of McCrory employee Michelle McDaniels, complained to Schafer that Harrelson had made various sexual comments and innuendoes about McDaniels' wife, that he had "slapped her rear end on more than one occasion," and that he had shown her "handcuffs and nipple clamps" he kept in his desk. (Doc. 30, Ex. 1). The defendant initially decided to reassign McDaniels to another supervisor. However, McDaniels' husband found that unacceptable. He wanted Harrelson disciplined. The record fails to demonstrate what additional action, if any, was taken by the defendant against Harrelson. (*Id.*).

## PROCEDURAL HISTORY

On August 10, 2000, Holsombach filed the first EEOC charge against McCrory, alleging no action had been taken against the harasser and that "although a management employee has been assigned to be present at any meetings between me and Greg Harrelson, I continue to be intimidated by his presence at the work site." (Doc. 23, Ex. 11, Def. Ex. 3). She filed her second EEOC charge on August 28, 2000. (*Id.* at Def. Ex. 4).

On November 7, 2000, Holsombach filed the original complaint under Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991, requesting trial by jury. Holsombach claimed disparate treatment premised on her gender, a hostile work environment, intentional infliction of emotional distress, the tort of outrage, and negligent and/or malicious supervision and training. (Doc. 1). The defendant filed its answer on January 12, 2001, asserting a number of affirmative defenses.

The plaintiff filed a third EEOC charge on January 17, 2001. (Doc. 23, Ex. 11, Def. Ex.

8

5).

The plaintiff filed a motion to amend her complaint on July 5, 2001, which was granted. On July 6, 2001, the plaintiff filed her first amended complaint wherein she adopted her original complaint and added a retaliation claim.

The defendant filed its motion for summary judgment on March 1, 2002.  (Doc. 22).  The issues have been fully briefed.  The plaintiff was allowed to supplement the record with evidence concerning the prior incidents involving McDaniels and Harrleson.  (Doc. 33).

## MOTION FOR SUMMARY JUDGMENT

### Summary Judgment Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The party seeking summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex*, 477 U.S. at

9

322-23, *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 259. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

10

The court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury and, therefore, the evidence of the nonmovant is to believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). "If reasonable minds could differ on the inferences arising from the undisputed facts, then a court should deny summary judgment." *Allen v. Tyson Foods*, 121 F.3d 642 (11th Cir. 1997).

### Hostile Environment

The plaintiff initially asserts a hostile work environment claim premised on sexual harassment. The defendant contends that summary judgment is due to be granted on this claim premised on the facts that "[t]here were no 'threats that were carried out'" (doc. 23 at 9); the alleged incidents do not constitute sexual harassment (doc. 23 at 10); and, the defendant has established a defense pursuant to *Faragher v. City Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998) (*id.* at 13).

When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of victim's employment and create an abusive working environment, Title VII is violated. *Oncale v. Sundowner Offshore Services,*

11

*Inc.*, 523 U.S. 75, 78, 118 S. Ct. 998, 1001, 140 L. Ed. 2d 201 (1998).  To establish a claim for a

hostile or abusive working environment, an employee must show:

> (1) that he or she belongs to a protected group; (2) that the employee has been
> subject to unwelcome sexual harassment . . .; (3) that the harassment must have
> been based on the sex of the employee; (4) that the harassment was sufficiently
> severe or pervasive to alter the terms and conditions of employment and create a
> discriminatorily abusive working environment; and (5) a basis for holding the
> employer liable.

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571 (11th Cir. 2000), *cert. denied,* 531 U.S. 1076, 121

S. Ct. 772, 148 L. Ed. 2d 671 (2001) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th

Cir. 1999) (en banc), *cert. denied*, 529 U.S. 1068, 120 S. Ct. 1674, 146 L. Ed. 2d 483 (2000)).  In

*Gupta*, the Eleventh Circuit stated:

> The fourth element . . . is the element that tests the mettle of most sexual
> harassment claims.  Requiring the plaintiff to prove that the harassment is severe
> or pervasive ensures that Title VII does not become a mere "general civility code."
> *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L.
> Ed. 2d 662 (1998).

*Gupta*, 212 F.3d at 583.  Title VII may include a prohibition of sexual harassment, but it is

clearly not a civility code.  *Mendoza*, 195 F.3d at 1245.

In *Mendoza*, the Eleventh Circuit, sitting en banc, reiterated the standards applicable to

hostile environment claims:

> Establishing that harassing conduct was sufficiently severe or pervasive to
> alter an employee's terms or conditions of employment includes a subjective and
> an objective component. . . .  The employee must subjectively perceive the
> harassment as sufficiently severe and pervasive to alter the terms or conditions of
> employment, and this subjective perception must be objectively reasonable.  The
> environment must be one that a reasonable person would find hostile or abusive
> and that the victim subjectively perceives to be abusive.  Furthermore, the
> objective severity of the harassment should be judged from the perspective of a
> reasonable person in the plaintiff's position, considering all the circumstances.

> The objective component of this analysis is somewhat fact intensive. . . .
> The courts should examine the conduct in context, not as isolated acts, and
> determine under the totality of the circumstances whether the harassing conduct is
> sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's
> employment and create a hostile or abusive working environment.

*Mendoza*, 195 F.3d at 1246 (internal quotations and citations omitted). The Supreme Court in

*Faragher* stated, "We have made it clear that conduct must be extreme to amount to a change in

the terms and conditions of employment . . . ." *Faragher*, 524 U.S. at 788, 118 S. Ct. at 2284

(citing *Carrero v. New York Housing Auth.*, 890 F.2d 569, 577-78 (2d Cir. 1989); *Moylan v.*

*Maries County*, 792 F.2d 746, 749-50 (8th Cir. 1986)).

As to the elements of a hostile work environment, the Eleventh Circuit has strictly

interpreted the requirements of severity and pervasiveness. The assertion of sexual harassment

must meet a high threshold as the courts have consistently held that Title VII was not designed as

a statute on civility, thus it would not purge all vulgarity from the workplace. *Baskerville v.*

*Culligan Internat'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995). In this circuit, two cases demonstrate

the range of behavior the court does and does not accept as rising to a sufficient level of severity

and pervasiveness: *Gupta*, 212 F.3d 571, and *Johnson v. Booker T. Washington Broadcasting*

*Service, Inc.*, 234 F.3d 501 (11th Cir. 2000).

In *Gupta*, the court held that the following actions were insufficient to constitute a hostile

work environment during a six to seven month period: (1) "look[ing her] up and down,"

(2) suggesting lunch at Hooters restaurant, (3) suggesting that she "change into casual attire

before dinner," (4) accompanying her and another couple to "a place where single people meet,"

(5) offering assistance if she needed anything, (6) changing her office to one across from the

harasser when she complained her office was too small, (7) offering to drop food at her house,

(8) calling her at home two or three times a week late at night and asking if she was in bed,

(9) asking if she had a boyfriend, (10) asking her to lunch, (11) calling other faculty members

"racist" and "evil," (12) putting a hand on her thigh in the office, (13) touching her bracelet and

saying, "Oh, it is a very nice bracelet," (14) touching her ring, (15) touching and lifting the hem

of her dress and commenting, "What kind of material is that?", (16) on a hot day when the air

conditioning was broken, Gupta walked into the alleged harasser's office when he was expecting

her and he had taken off his dress shirt and was wearing an undershirt and "he unbuckled his belt,

pulled down his zipper and start[ed] tucking his [dress] shirt in, (17) making comments that she

was "looking very beautiful" and that "Indian people are really decent, and the Caribbean and

Western people are really promiscuous" and stating that he could tell she was "innocent and []

didn't have much experience," (18) after a storm, commenting that she should have called him

since she was alone and he would have spent the night, and (19) other looks that made her

uncomfortable. *Gupta*, 212 F.3d at 578-79.

The court reasoned that "except for the phone calls to her home, none of [the alleged

harasser's] conduct can be described as frequent." *Id.* at 584. While the court recognized the

phone calls to her home were frequent, Gupta "never contended that they were intimidating or

threatening. At no point during these phone calls did the alleged harasser ask Gupta for a date or

make sexually explicit remarks or innuendoes." Further, little of the behavior constituted sexual

innuendo and the touching of her ring and bracelet, even if sexual in nature, were not "severe,

threatening, or humiliating." The court did acknowledge that the alleged harasser's touching of

Gupta's knee and hem was inappropriate, but each incident was isolated in a six to seven month

time frame, was "momentary, and neither was coupled with any verbal suggestions or advances."

14

*Gupta*, 212 F.3d at 585. Thus, the court held that "a finding that Gupta's complaints constitute sexual harassment would lower the bar of Title VII to punish mere bothersome and uncomfortable conduct, and would 'trivialize true instances of sexual harassment.'" *Gupta*, 212 F.3d at 586, quoting *Mendoza*, 195 F.3d at 1252 n.10.

However in *Johnson*, 234 F.3d 501, the court reversed a grant of summary judgment on the plaintiff's sexual harassment claim, which included the following conduct: (1) Donnell repeatedly commented that Johnson had a sexy voice; (2) Donnell called out Johnson's name and winked at her; (3) Donnell called out Johnson's name and pulled his pants up in an obscene manner, revealing an imprint of his private parts; (4) Donnell called out Johnson's name and then looked her "up and down" while staring at her in a sexy manner; (5) Donnell said "Johnson, I like you and as long as I like you, you're going to be all right. You don't have to worry about your job;" (6) Donnell repeatedly attempted to massage Johnson's shoulders against her wishes; (7) Donnell stuck his tongue out at Johnson in an obscene manner; (8) Donnell inappropriately rubbed his body parts against Johnson; (9) Donnell asked Johnson why a person with a body like hers always covered it up; (10) Donnell commented that he could "pull [Johnson] up" anytime, a comment Johnson interpreted as a sexual reference; (11) Donnell got close to Johnson's face as if to kiss her; (12) Donnell commented that Johnson "really knocked him off his feet;" (13) Donnell stated that "he had to stay on his side of the room;" (14) Donnell commented inappropriately about sex to Johnson and questioned Johnson about her sex life; and (15) Donnell asked Johnson if she ever got lonely. *Johnson*, 234 F.3d at 506. The court stated:

> There is no doubt Johnson subjectively perceived Donnell's behavior as harassing. Turning to the four objective factors: the conduct alleged by Johnson was not infrequent (Johnson points to roughly fifteen separate instances of

15

harassment over the course of four months); the conduct was severe (Donnell's behavior included giving Johnson unwanted massages, standing so close to Johnson that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his private parts); the conduct was physically threatening and humiliating (same); and the conduct interfered with Johnson's job performance (she could not get along with her on-the-air co-host).

*Id.* at 509.

In the present case, Holsombach points to the following incidents of harassment that purportedly occurred during a four-month period: (1) Four instances where Harrelson made comments about her breasts; (2) four instances where Harrelson told her he wanted to take her to the creek to have sex; (3) two instances where Harrelson asked Holsombach to come to a motel with him, dress up as a cop and dance for him; (4) two "hugs;" (5) two instances wherein Harrelson told Holsombach that he "was McCrory" and could fire her; (6) an instance where Harrelson allegedly told Holsombach to come to work on Sunday when no one else was there so he could have sex with her; (7) an instance wherein Harrelson told Holsombach if she had sex with him at the Helena work site trailer, he would put her in charge of her own crew and give her a pay raise; and, (8) Harrelson commented that seeing women eat Blowpops and bananas "bothered him sexually."

The number of incidents is significant for purposes of the pervasiveness requirement on summary judgment. Accordingly, the next question involves severity. In *Johnson*, the court specifically noted that the actions constituting severe conduct were instances of touching – the massage, touching her from behind – and the display of Donnell's private parts. The court concluded that those contacts were threatening and humiliating. In this matter, the only allegations of touching are two hugs: one where Harrelson patted Holsombach's shoulder and

16

told her she was doing a good job; the other where Harrelson put his arm around Holsombach's shoulder when she became very upset after telling him about her spousal problems. As the court reasoned in *Gupta* regarding the touching of Gupta's knee and hem, these hugs may have been inappropriate, but they are not threatening or humiliating.

While the severity of the alleged touching of Holsombach does not reach the level demonstrated in *Johnson*, the remainder of the alleged encounters are more direct and unquestionably sexual in nature. Harrelson's sexual requests were directly connected to comments by Harrelson that (1) he was McCrory and that he could "fire anybody he wanted to" and "he could fire [her];" (2) submission to his requests could lead to monetary gain for the plaintiff; and (3) submission to his requests could lead to additional responsibilities with the defendant. (Holsombach Dep. at 94-95). Additionally, the court finds that the severity of Harrelson's conduct is further demonstrated by the fact that the plaintiff informed the Panel that she was uncomfortable returning to the job site once she reported her complaints. The court is satisfied that the plaintiff has established that she subjectively viewed the encounters to be threatening and humiliating. Moreover, the court further finds that a reasonable person in plaintiff's position – receiving direct requests for sex from one's supervisor under threat or reprisals or promises of job rewards – would also view the alleged proposals to be threatening or humiliating. The defendant's motion is therefore due to be denied on this basis.

### Employer Liability

In *Frederick v. Sprint/United Management Company*, 246 F.3d 1305, 1311 (11th Cir. 2001), the Eleventh Circuit stated:

> [W]hen analyzing whether the employer should be liable for a supervisor's

17

> harassment, courts should separate these cases into two groups: (1) harassment which culminates in a "tangible employment action," such as discharge, demotion or undesirable reassignment, and (2) harassment in which no adverse "tangible employment action" is taken but which is sufficient to constructively alter an employee's working conditions.

In the current matter, the plaintiff asserts that one of the grounds for her termination was her resistance to Harrelson's requests.

In *Johnson*, 234 F.3d 501, the Eleventh Circuit recognized a strict liability standard for employers for sexual harassment where a tangible employment action occurred when the alleged harasser was the plaintiff's supervisor and the alleged harasser/supervisor was involved in a tangible employment action against the plaintiff as a result of the sexual harassment. *Id.* at 509 (citing *Faragher*, 524 U.S. at 807 (1998)). Similarly, in *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1247 (11th Cir. 1998), the court stated:

> any time the harasser makes a tangible employment decision that adversely affects the plaintiff, an inference arises that there is a causal link between the harasser's discriminatory animus and the employment decision. A Title VII plaintiff, therefore, may establish her entire case simply by showing that she was sexually harassed by a fellow employee, and that the harasser took a tangible employment action against her.

The Eleventh Circuit has been "unwilling to read the *McDonnell Douglas-Burdine* framework" into hostile environment claims such as that presented herein. *Johnson*, 234 F.3d at 510.

When Holsombach returned to the work site on November 20, 2000, Harrelson was called at the main office from the site by Steve Hess. (Harrelson Dep. at 106). He went to talk with Judy about the plaintiff and what to do. (*Id.*). Judy called Hess and the three of them (Judy, Hess, and Harrelson) talked about the situation. Harrelson told Judy that he did not have anything for the plaintiff to do. (*Id.*). Premised, at least in part, on this, Judy told Hess to

18

terminate her that day due to a lack of work. (*Id.*).  Thereafter, on December 6, 2000, Harrelson

signed the plaintiff's termination report that is required by company policy to be completed. (*Id.*

at 108-09; Doc. 23, Ex. 17).  It specified that she was terminated because no work was available.

(*Id.*).

Although the defendant asserts that Harrelson was not involved in the decision to

terminate the plaintiff, the court must disagree.  The foregoing clearly establishes for purposes of

the present motion, that Harrelson was in fact involved in the termination decision.  To find

otherwise would require the court to construe the evidence in a light most favorable to the

defendant -- something the court cannot do at this juncture.  Accordingly, the motion is due to be

denied as to this claim.

### *Ellereth/Faragher* Affirmative Defense

In cases where "no tangible employment action is taken, a defending employer may raise

an affirmative defense to liability or damages, subject to proof by a preponderance of the

evidence, *see* FED. RULE CIV. PROC. 8(c)." *Faragher*, 524 U.S. at 807.  To advance this defense,

the defendant must show the following:

> (a) [it] exercised reasonable care to prevent and correct promptly any sexually
> harassing behavior; and
>
> (b) [the] plaintiff employee unreasonably failed to take advantage of any
> preventative or corrective opportunities provided by the employer or to avoid
> harm otherwise.

*Faragher*, 524 U.S. at 807; *Ellereth*, 524 U.S. at 765.  The defendant argues that this defense is

applicable in this case and that its policy protects it from liability.  (Doc. 23 at 13).  The plaintiff

retorts that the defense is not available because Harrelson participated in the termination

decision.  (Doc. 27 at 9).

The defendant's sexual harassment policy is simple and provides its employees with multiple avenues to report misbehavior.  (Doc. 23, Ex. 2 & 3).  Holsombach signed and received a copy of McCrory's harassment policy on March 15, 2000, at the time she was hired, and again on May 17, 2000, which according to the plaintiff's deposition, would have been about the time of the bulk of the alleged incidents.  Holsombach asserted numerous claims of inappropriate behavior by Harrelson beginning as early as July 24, 2000.  She was on medical leave from about July 28, 2000, until August 20, 2000.  During her meeting with the Panel on July 24, 2000, the plaintiff told them about the fact that Harrelson had shown her favoritism by taking her for rides in the ATV; that he asked her to go to the pond to have sex with him; that he asked her to come to work on a Sunday so that she could have sex with him; and, that she had asked Harrelson for a $500.00 advance and he told her that he could not loan her the money, but they could go to a motel and she could dance on a table for the $500.00.  (Doc. 23, Ex. 5).  The plaintiff failed to tell panel about the comments regarding her breasts; the details regarding the proposition to dress up like a cop and have sex with him at a motel; the conversation regarding bananas and blow-pops; and, the direct offer of a better job in exchange for sex.  (*Id.*).  Within a week, the Panel investigated the charges, reached a determination that the investigation was inconclusive, and offered a "resolution" to Holsombach.  Because the plaintiff expressed apprehension about returning to the work site before the investigation was complete, McCrory granted her paid leave until that time.  The "resolution" did not change her assignment, but it did change to whom she reported and made provisions for only supervised contact between Holsombach and Harrelson.  According to the defendant, Holsombach agreed to the resolution.  One of the

"recommendations" of the Panel was that McCrory "make available" sensitivity/management training for Harrelson. (Doc. 23 at Ex. 7, July 31, 2000 Memorandum). As best this court can discern, the defendant has not provided Harrelson with the recommended training.

Bradley Judy did visit Holsombach on August 30, 2000, on-site to determine whether the environment had improved. (Doc. 23, Ex. 7, August 30, 2000 Memorandum). Holsombach told Judy at that time that Harrelson had not sexually harassed her since the meeting. (*Id.*). Holsombach did not tell Judy that she felt intimidated by Harrelson's presence. (*Id.*). At that time, McCrory had not yet received notice of Holsombach's EEOC complaint filed on August 10, 2000.

Even if this defense were not precluded by the fact that Harrelson actively was involved in the decision to terminate the plaintiff, the court cannot conclude under the foregoing circumstances that the defendant is entitled to prevail on its *Ellereth/Faragher* defense at this juncture. The defendant sent Holsombach back to work under the supervision of Harrelson even after she had expressed apprehension about working with him. Additionally, the defendant has failed to provide the recommended training for Harrelson as stated in the resolution. This is particularly troubling in view of the fact that this is Harrelson's second incident within a relatively short time and the Panel specifically recommended it. Because the court is not satisfied as a matter of law that the defendant's actions were adequate under the circumstances, defendant's motion for summary judgment is due to be denied on this claim.

### Retaliation

The plaintiff's burden to establish a retaliation case is as follows:

To establish a prima facie case of retaliation under Title VII, a plaintiff must show

that (1) [s]he engaged in statutorily protected expression [(participation or opposition)]; (2) [s]he suffered an adverse employment action; and (3) there is some causal relation between the two events.

*Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (quoting *Olmstead v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)). Where the plaintiff meets this burden, the "employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action." *Pennington*, 261 F.3d at 1266 (citing *Olmstead*, 141 F.3d at 1460; *Meeks*, 15 F.3d at 1021). If the defendant presents such a reason, the burden shifts back to the plaintiff to "prov[e] by the preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct." *Pennington*, 261 F.3d at 1266 (citing *Olmstead*, 141 F.3d at 1460).

The first two elements are not contested. The plaintiff engaged in protected activities, including the filing of the present matter on November 7, 2000. (Doc. 1). She suffered an adverse employment action when she was terminated shortly thereafter. The defendant contests the third element--whether there was a causal connection between the two other elements. (Doc. 23 at 17). It asserts that she was terminated over four months after she first engaged in protected activities and over one month after the defendant first began terminating masons and masonry laborers. (*Id.*).

The plaintiff contends she was fired in retaliation for her protected activities, including the filing of her EEOC charges and the present complaint. Her first EEOC charge was filed on August 10, 2000. She filed this complaint on November 7, 2000. Her termination from the

22

company occurred on November 20, 2000.[8]  As stated in the last section, the defendant contends

that the plaintiff was fired due to a lack of work.  In support of this contention, the defendant

presents a list of other masonry laborers on the same job and their termination dates for lack of

work dating back to October 2000.  (Doc. 23, Ex. 16).  The record also includes notes made by

Harrelson stating that he had kept Holsombach on the payroll longer than others because of her

financial troubles.  (Doc. 27, Ex. 8).  In opposition to the motion, the plaintiff has submitted a list

of "Jobs in Progress" during the relevant period (doc. 27, ex. 2) and an employee list showing

McCrory employees and job position categories held for the pay period ending December 3,

2000, and December 10, 2000 (*id.*, ex. 3).

The foregoing McCrory records show that although a number of masonry laborers were

terminated during October and November 2000 (doc. 23, ex. 16), others were still working at

one job site of the defendant in the Birmingham area (doc. 27, ex. 2 & 3).  According to the

records, approximately fifteen (15) masonry laborers were working at the "Helena Masonry" site

("0004" code) during the last of November and the beginning of December.  (*Id.*).  In view of this

evidence challenging the defendant's statement that no work was available, the court finds that it

cannot conclude as a matter of law that the motion is due to be granted as to this claim.

### Intentional Infliction of Emotional Distress and Outrage Claims

The Alabama Supreme Court does not recognize a tort for the intentional infliction of

emotional distress, rather it recognizes the tort of outrage where:

> willful wrongs, or those made so recklessly as to equate to willfulness, authorize

---

[8] As already noted, dispute in the facts exists as to whether Holsombach's termination occurred on December 6, 2000, or November 20, 2000.  Giving the plaintiff the inference most favorable to her, the discrepancy in dates is irrelevant to the decision.  Holsombach's termination in either case still came after others in her position were terminated for lack of work.

> recovery in damages for the mental suffering caused thereby, and we now
> recognize that one who by extreme and outrageous conduct intentionally or
> recklessly causes severe emotional distress to another is subject to liability for
> such emotional distress and for bodily harm resulting from the distress. The
> emotional distress . . . must be so severe that no reasonable person could be
> expected to endure it. Any recovery must be reasonable and justified under the
> circumstances, liability ensuing only when the conduct is extreme. Comment,
> *Restatement (Second) of Torts*, § 46 (1965) at 78. By extreme we refer to conduct
> so outrageous in character and so extreme in degree as to go beyond all possible
> bounds of decency, and to be regarded as atrocious and utterly intolerable in a
> civilized society. Comment (d), *Restatement, supra* at 72.

*American Road Service Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1981).

> The tort of outrage is an extremely limited cause of action. It is so limited that
> this Court has recognized it in regard to only three kinds of conduct: (1) wrongful
> conduct in the family-burial context, *Whitt v. Hulsey*, 519 So. 2d 901 (Ala. 1987);
> (2) barbaric methods employed to coerce an insurance settlement, *National Sec.
> Fire & Cas. Co. v. Bowen*, 447 So. 2d 133 (Ala. 1983); and (3) egregious sexual
> harassment, *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989). *See also*
> Michael L. Roberts and Gregory S. Cusimano, Alabama Tort Law, § 23.0 (2d ed.
> 1996). In order to recover, a plaintiff must demonstrate that the defendant's
> conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and
> (3) caused emotional distress so severe that no reasonable person could be expected to
> endure it." *Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990)
> (citing *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1981)).

*Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000). In *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322

(Ala. 1989), the court recognized the tort of outrage in a sexual harassment suit where the

plaintiffs alleged their defendant supervisor took the following actions:

> (1) invited [plaintiffs] to swim in his pool nude with him; (2) told [plaintiff] that
> his hands were cold and asked if he could put them in her pockets to keep them
> warm; (3) told the plaintiffs that he would "put a stick on their machines" so they
> could masturbate while working; (4) said he could perform intercourse as fast as
> one of the plant machines could operate; (5) said that he wished that the plaintiffs
> would come to work braless and wear less clothing; (6) told one of the plaintiffs
> that if she had not stayed up all night having sex she could do her work properly;
> (7) told one employee that if she would give him 30 minutes with her that he
> would fill her pants in nine months for her; (8) acted as if he was going to pinch
> one of the plaintiff's breasts with a pair of pliers and with his hands; (9) said that

24

he should send one of the plaintiffs across the street to where a group of men were standing because she stayed sexually aroused all of the time; (10) told one of the plaintiffs that he was very tired and asked her if she would accompany him to the restroom and hold his penis while he urinated; (11) told one of the plaintiffs that her nipples were as large as another employee's entire breasts; (12) attempted to follow one of the plaintiffs into the restroom and when she asked him where he was going, said that he was going to help her; (13) followed one of the plaintiffs one night; (14) said that a table in his office had been damaged when one of the plaintiffs and a male co-employee had sex on top of it; (15) openly stared at plaintiffs' sexual anatomy; (16) put his arm around the plaintiffs, grabbed their arms, and stroked their necks; and (17) made other lewd remarks and gestures to the plaintiffs.

*Id.* at 324. The court held, however, that plaintiffs' "generalized complaints" to their employer were insufficient to establish liability. "The tort of outrage provides a remedy for 'extreme and outrageous conduct,' *American Road Service Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980), and so should not be the basis for vicarious or *respondeat superior* liability except in the most compelling circumstances." *Busby*, 551 So. 2d at 327.

While the court finds that Harrelson's alleged conduct is severe and pervasive for purposes of the plaintiff's Title VII hostile environment claim, the court cannot find that the conduct is "beyond all possible bounds of decency" so as to support a claim of outrage. While Holsombach's initial complaint to McCrory was more specific than the complaints lodged with the defendants in *Busby*, the conduct alleged by Holsombach is less severe than that alleged by the plaintiffs in *Busby*. Thus, the defendant's motion for summary judgment is due to be granted on these claims (intentional infliction of emotional distress and outrage).

### Negligent and/or Wanton Hiring, Training, and Supervision

The Alabama Supreme Court characterized negligent training and supervision as follows:

In the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of

25

such unfitness has been brought to him.  Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master, or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge.  It is incumbent on the party charging negligence to show it by proper evidence.  This may be done by showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice.  While such specific acts of alleged incompetency can not be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant to leave it to the jury whether they would have come to his knowledge, had he exercised ordinary care.

*Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1003 (Ala. 1993) (citing *Lane v. Central Bank of Alabama, N.A.*, 425 So. 2d 1098, 1100 (Ala. 1983) (quoting *Thompson v. Havard*, 235 So. 2d 853 (1970))); *see also Ledbetter v. United American Ins. Co.*, 624 So. 2d 1371 (Ala. 1993).  The Alabama Supreme Court further clarified the requirements of a negligent training and supervision claim by stating:

[A]n employer is liable for the intentional torts of its agent (1) if the wrongful acts were committed in the line and scope of the agent's employment; or (2) if the acts were taken in furtherance of the business of the employer; or (3) if the employer participated in, authorized, or ratified the wrongful acts.  In order to show that the employer either implicitly "ratified" or "tolerated" sexual harassment by one of its employees, this Court stated that, *in addition to proving the underlying tortious conduct of an offending employee*, a complaining employee must show that his or her employer "(1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation."

*Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820 (1999) (citing *Potts v. BE & K Construction Co.*, 604 So. 2d 398, 400 (1992)).

McCrory had actual knowledge of Harrelson's alleged tortious conduct involving McDaniel's and Holsombach.  In *Cottingham*, 634 So. 2d at 1003, the Alabama Supreme Court noted that employer's knowledge of prior sexual harassment was determinative on the issue of actual notice.  A genuine issue of material fact exists as to whether McCrory's resolution providing that Holsombach return to the same position, under Harrelson's supervision with an intermediary, and that Harrelson be provided with sensitivity training was adequate under the circumstances or whether it was tolerance of his conduct.  This is particularly true in view of the absence of any evidence that the defendant disciplined hi for the conduct involving McDaniels and the absence of any evidence that he received any of the required training as a result of the incidents with Holsombach.  Thus, defendant's motion for summary judgment on this claim is due to be denied.

## CONCLUSION

Therefore, defendant's motion for summary judgment is due to be denied in part and granted in part. The defendant's motion as to the hostile environment, retaliation, and negligent and/or wanton hiring, training, and supervision claims is due to be denied and is due to be granted on the intentional infliction of emotional distress and outrage claims.  An order consistent with the courts findings will be entered.

**DONE**, this  *26th* day of March, 2003.

**JOHN E. OTT**
United States Magistrate Judge

27